UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANASIA SMITH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:25-cv-2677 |
| HARRIS COUNTY; | § | |
| ED GONZALEZ; | § | |
| PAULITA FRANCO; | § | |
| TALIA RUBIO; | § | |
| DE'ESSENCE LEWIS; | § | |
| LASHA M. HAYNES; | § | JURY REQUESTED |
| TAYLOR NESHAY HODGES; and | § | |
| TERRENCE ALFORD; | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

### I. INTRODUCTION

1.      On July 15, 2023 at 1:00 AM, nine detention officers at the Harris County Jail—among them multiple ranking officers—violently assaulted Anasia Smith ("Ms. Smith" or "Plaintiff"), a twenty-two-year-old jail resident who had been performing voluntary and unpaid duties cleaning her housing unit. Exhausted from her shift, Ms. Smith asked to be released from the job so she could sleep. Defendant Detention Officer ("DO") Paulita Franco responded by taunting and demeaning Ms. Smith. After a verbal exchange, Defendant Franco began punching Ms. Smith in the head. At the time, Ms. Smith weighed only 107 pounds, wielded no weapon, posed no threat, and had no prior disciplinary history. As Ms. Smith reacted in self-defense, Defendant Franco continued to punch her.

2.      Seconds later, more officers joined in—nine in all—doubling down on their assault with a steady stream of punches to Ms. Smith's head and arms. Even when Ms. Smith curled into

the fetal position on the floor, they continued to pummel her in the back of the head for nearly a minute. ***In all, the officers struck her more than 45 times.***

3.    Almost two years later, Ms. Smith continues to live with the physical, psychological, and emotional consequences of this assault. She has chronic backpain, headaches, and spells of dizziness, which make her daily life activities difficult or impossible. She was also diagnosed with depression for the first time after the assault.

4.    Sadly, what happened to Ms. Smith is not an anomaly. The Harris County Jail ("HCJ" or "the jail") has for years been plagued by a culture of violence, with officers quick to use force as their primary means of responding to any conflict or disagreement. From 2020 through 2023, officers under Defendant Sheriff Ed Gonzalez's supervision used similar force more than 800 times.[1] The prevalence of officer-on-resident violence has prompted condemnations from state oversight bodies, the United States Department of Justice, the press, detained individuals and their families, and even jail leaders themselves.[2] As a candidate in 2016, Defendant Gonzalez lamented the lack of training on "de-escalation technique[s]" and identified the need to "end this culture that quickly leads to physical altercation."[3]

5.    Through their acts or omissions, Defendants Paulita Franco, Talia Rubio, De'Essence Lewis, Lasha M. Haynes, Taylor Neshay Hodges, and Terrence Alford (collectively,

---

[1] Tina Macias, Jeremy Rogalski, Jennifer Cobb, *'Struck' – Hundreds of inmates punched in head in Harris County Jail*, KHOU 11 (Dec. 6, 2024), https://www.khou.com/article/news/investigations/struck-inside-harris-county-jail-inmate-head-punch-houston-texas-sheriff-ed-gonzalez-detention-officer/285-40eea725-3ab7-49dc-8b18-0d0840e267c5 (last visited June 8, 2025) [hereinafter "KHOU 11, *Struck*"].

[2] *See, e.g.*, Lucio Vasquez, *Harris County Jail guards charged for allegedly beating man into a coma*, HOUSTON PUB. MEDIA (May 10, 2024), https://www.houstonpublicmedia.org/articles/news/criminal-justice/2024/05/10/487068/harris-county-jail-guards-charged-for-allegedly-beating-man-into-a-coma/ (last visited June 8, 2025); U.S. Dep't of Just., Civil Rights Division, Investigation of the Harris County Jail (June 4, 2009), available at https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/harris_county_jail_findlet_060409.pdf [hereinafter "DOJ Report"].

[3] *Ron Hickman, Ed Gonzalez face off in ABC13/Univision debate*, ABC 13 (Oct. 18, 2016), https://abc13.com/debate-harris-county-sheriffs-office-sheriff-lawenforcement/1552812/ (last visited June 8, 2025) [hereinafter "ABC 13 Sheriff Debate"].

the "Individual Defendants"), Harris County, and Sheriff Ed Gonzalez (with the Individual Defendants, "Defendants"), violated the Fourteenth and First Amendments to the United States Constitution through their use of excessive force and retaliation against Ms. Smith. Ms. Smith brings these claims for compensatory and punitive damages against Defendants under 42 U.S.C. § 1983, and shows the following.

## II. JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims occurred in this district and division and several defendants are domiciled in this district and division.

## III. PARTIES

8.      Plaintiff Anasia Smith was detained in the HCJ in July 2023 when she was assaulted by nine HCJ detention officers. Ms. Smith currently resides in Brooklyn, New York.

9.      Defendant Harris County is a government entity organized under the laws of the State of Texas. The Harris County Sheriff's Office, which oversees the Harris County Jail, is a division or department of Harris County. Ms. Smith suffered injuries at the hands of Harris County employees while detained in the HCJ. Harris County is located in the Southern District of Texas.

10.     Defendant Ed Gonzalez is the elected sheriff of Harris County. He is the administrator of the Harris County Jail. Tex. Loc. Gov't Code §§ 351.034, 351.041. He is also the final policymaker for the policies, procedures, and rules governing the Harris County Jail. He is sued in an individual capacity.

11.     Defendant Paulita N. Franco was a Detention Officer in the HCJ in July 2023. Defendant Franco initiated the physical assault on Ms. Smith, and continued punching her

3

throughout the duration of the incident. Defendant Franco resides in Pasadena, Texas. Defendant Franco is sued in an individual capacity.

12.    Defendant Lasha M. Haynes was a Detention Officer in the HCJ in July 2023. Defendant Haynes joined other officers in punching Ms. Smith repeatedly, escalating the altercation, and continued punching her throughout the duration of the incident. Defendant Haynes resides in Pattison, Mississippi. Defendant Haynes is sued in an individual capacity.

13.    Defendant De'Essence Lewis was a Detention Officer in the HCJ in July 2023. Defendant Lewis joined other officers in punching Ms. Smith repeatedly, escalating the altercation, and continued punching her throughout the duration of the incident. Defendant Lewis resides in Houston, Texas. Defendant Lewis is sued in an individual capacity.

14.    Defendant Talia Rubio was a Detention Officer in the HCJ in July 2023. Defendant Rubio joined other officers in punching Ms. Smith repeatedly, escalating the altercation, and continued punching her throughout the duration of the incident. Defendant Rubio resides in Houston, Texas. Defendant Rubio is sued in an individual capacity.

15.    Defendant Terrence Alford, Badge #913, was a Sergeant in the HCJ in July 2023. Defendant Alford participated in Ms. Smith's assault, and sanctioned his subordinates in their sustained violence. Defendant Alford resides in Houston, Texas. Defendant Alford is sued in an individual capacity.

16.    Defendant Taylor Neshay Hodges, Badge #286, was a Sergeant in the HCJ in July 2023. Defendant Hodges participated in Ms. Smith's assault, escorted Ms. Smith to medical following the incident, and sanctioned her subordinates in their sustained violence. Defendant Hodges resides in Houston, Texas. Defendant Hodges is sued in an individual capacity.

## IV. STATEMENT OF FACTS

**A. Ms. Smith entered Harris County Jail and became a trusty based on model behavior.**

17.    Anasia Smith moved to Houston from New York in February 2022. She was 21 years old, and it was her first time living on her own. She was excited to build a new life for herself and her young son.

18.    On or around June 27, 2023, Ms. Smith was arrested for using a debit card without the owner's permission—a charge that was ultimately dismissed. Ms. Smith was detained in the HCJ following her arrest. Ms. Smith was 22 years old, five feet three inches tall, and weighed 107 pounds. She had no documented mental health diagnosis or any chronic physical ailments upon her entry to the jail.

19.    Ms. Smith kept a low profile in jail by staying focused on resolving her case and getting home to her son, who was by then living with Ms. Smith's mother back in New York. Her good behavior was noticed, and she was assigned a position as a volunteer worker, or a "trusty." Jail administrators placed her in the trusty dorm, where they gave her a voluntary, unpaid job cleaning housing units and passing out breakfast during the overnight shift, which ran from 9:00 p.m. to 5:00 a.m.

20.    After several days working her shift, the labor and grueling hours left Ms. Smith exhausted. On the evening of July 15, 2023, Ms. Smith began her shift cleaning a unit. Two officers were supervising her: Defendant Franco and one other officer, DO Antondria Reece. DO Reece was stationed in the unit's command center, referred to as the "bubble," and was responsible for locking and unlocking doors in the unit.

21.    At or around 1 a.m., Ms. Smith was sweeping the unit. Defendant Franco approached Ms. Smith and criticized Ms. Smith's sweeping. Ms. Smith was annoyed with these

5

comments and exhausted by her back-to-back-to-back late-night shifts. She decided the preferential trusty housing was no longer worth the exhaustion and requested to resign from her position so she could get some sleep.

22.    Initially, DO Reece, observing from the bubble, indicated that Ms. Smith could resign her voluntary work assignment, unlocking the unit door for Ms. Smith to leave the unit. Ms. Smith began walking to the facility's command center to report that she was resigning and needed a new cell assignment, as well as to complain about Defendant Franco's verbal harassment.

23.    Defendant Franco, however, did not want her to leave. Defendant Franco told Ms. Smith she had to finish her voluntary, uncompensated shift before she could resign. Ms. Smith was confused but followed DO Reece's indication that she could exit the unit.

**B. Defendant Franco instigated a confrontation with Ms. Smith and initiated a violent assault as Ms. Smith attempted to file a complaint.**

24.    When Ms. Smith walked through the door that DO Reece had opened for her, Defendant Franco followed her. Ms. Smith continued walking toward the facility's command center, where grievance forms are kept, to resign from her voluntary position, request a new housing assignment, and file a grievance against Defendant Franco.

25.    Trailing Ms. Smith, Defendant Franco continued taunting her. Defendant Franco said, in sum or substance, "This is why you belong in jail; you don't listen, you don't follow rules. People like you will be in jail forever."

26.    Ms. Smith reached the command center in the middle of the hallway and began reporting her resignation and Defendant Franco's harassment to the officer there. Defendant Franco attempted to interfere with Ms. Smith's report and continued her profane tirade against Ms. Smith, telling the command center officer, "This little bitch right here don't listen." Defendant

Franco continued taunting Ms. Smith, preventing Ms. Smith from filing a complaint or grievance.[4]



27.      Tired, frustrated, and upset by the taunting from Defendant Franco, Ms. Smith regrettably responded to Defendant Franco by referring to Defendant Franco's mother as "a bitch." Defendant Franco turned towards Ms. Smith and pointed a finger at her, goading her: "Say it again." Ms. Smith began to verbally respond, stepping forward slightly, but did not touch Defendant Franco. Defendant Franco raised an arm as she stepped towards Ms. Smith, and then without warning punched Ms. Smith in the head.

28.      Stunned, Ms. Smith instinctively hit back in self-defense as Defendant Franco, who upon information and belief was substantially heavier than the petite Ms. Smith, continued to strike at her, pushing Ms. Smith off-balance and causing her to stumble backwards while trying to defend herself. Another officer (hereinafter, "Unknown Officer 1") who was in the hall, ran up behind Defendant Franco but did not intervene.

**C.  Other officers joined Defendant Franco in violently assaulting Ms. Smith.**

29.      As Defendant Franco continued to strike Ms. Smith, Defendant Haynes entered the hallway from a side door. Within a second of entering the scene, Defendant Haynes swung her arm back and punched Ms. Smith on the side of her head, causing her to fall into Defendant Franco.

---

[4] The assault was captured on surveillance video without sound, attached as Exhibit A. The images throughout this Complaint were taken from that video.

Defendants Haynes and Franco continued punching Ms. Smith in the head, driving her backwards. Defendant Franco grabbed Ms. Smith's shoulders to thrust Ms. Smith into a wall, as Defendant Haynes continued delivering heavy blows to Ms. Smith's head. As Ms. Smith flailed her arms out trying to protect herself, Defendant Franco landed a closed-fist blow directly on top of Ms. Smith's head.

 



30.     Defendant Lewis then entered the hall from the opposite direction, and immediately began striking Ms. Smith's head from behind. Defendants Franco, Haynes, and Lewis drove Ms. Smith backwards into the opposite wall, while all three simultaneously punched her head and face.

 

31.     Defendant Haynes then pulled, and Defendant Lewis pushed, Ms. Smith into a

seated position on the floor. Defendant Lewis grabbed Ms. Smith by the neck of her shirt, as Defendant Franco continued punching Ms. Smith's head. Defendant Lewis dragged Ms. Smith backwards along the floor, as she and Defendant Franco continued punching Ms. Smith's head. Defendant Franco tripped over Ms. Smith's legs and ended up on the floor. By this point, Unknown Officer 1 had left the scene.

 

32.    Defendant Lewis continued to drag Ms. Smith onto her back, as Defendant Haynes charged at her and continued punching her from above. As Defendant Lewis held Ms. Smith down, Defendant Haynes stood over Ms. Smith and continued punching. Ms. Smith instinctively attempted to curl herself into the fetal position, lifting her arms to protect her head.

33.    Defendant Rubio then ran down the hallway and joined the assault. As Defendant Lewis dragged Ms. Smith into a seated position, Defendant Rubio began pulling Ms. Smith's hair and punching Ms. Smith's head.



34.    At this point, if not significantly earlier, Ms. Smith was immobilized on the floor

with her hands in front of her face trying to protect herself from the blows. She was surrounded by four officers and clearly did not pose a threat.



35.     Nonetheless, Defendant Haynes dragged Ms. Smith backwards by her shirt while Defendant Rubio continued punching her. Ms. Smith held her arms up to her face to shield herself. Defendant Haynes slammed her back into the floor, then dragged her by her shirt to the other side of the hallway. Defendants Haynes, Franco, Rubio, and Lewis then surrounded Ms. Smith, trading off delivering blows, as Ms. Smith lay in the fetal position on the floor. Defendant Franco delivered repeated blows to Ms. Smith's head. In all, Defendant Franco hit Ms. Smith thirteen times while Ms. Smith was on the floor pinned by three other officers.

36.     Defendant Alford, Officer Yvonne Dupont, and a third officer (hereinafter "Unknown Officer 2") then ran into the hallway, observing closely as the punching continued. The guards surrounded Ms. Smith on the floor, as, upon information and belief, one or more of them held her legs down. Defendant Alford moved closer and continued to observe closely, while Defendant Rubio took over for Defendant Franco in delivering blows to Ms. Smith's head. Defendant Rubio struck Ms. Smith in the head approximately eight times in sixteen seconds, grabbed Ms. Smith by her hair, and shoved her face into the concrete floor, all while Ms. Smith was on the floor, compliant and defenseless.

 



37.     The officers turned Ms. Smith onto her stomach and began to handcuff her behind her back. Defendant Hodges then opened and entered from a side door, which had a window through which she could observe the scene, and secured the handcuffs. Defendant Rubio and Officer Dupont pulled Ms. Smith to her feet and handed her off to Defendant Hodges.



38.     In all, Defendants punched and struck Ms. Smith's head more than forty-five times. Defendants inflicted at least thirty of those punches while Ms. Smith was on the ground defenseless, surrounded by multiple officers. Defendant Franco alone struck Ms. Smith twenty-seven times, including thirteen blows to the head while Ms. Smith lay in the fetal position surrounded by officers.

39.    In her written report following the assault, Defendant Franco attempted to justify the assault by claiming Ms. Smith was somehow "actively resisting" commands to place her hands behind her back "by holding her hands above her head and curling her feet into her body." In other words, Defendant Franco characterized Ms. Smith's actions—curling into the fetal position and trying to protect herself from repeated punches to her head—as "actively resisting."

40.    Following the assault, Defendants Hodges and Rubio and Officer Dupont took a traumatized Ms. Smith to Health Services for medical care. As they were escorting her, they taunted and threatened her. Another officer told her, in sum or substance, "You're lucky I wasn't there."

41.    Upon information and belief, neither Defendant Hodges nor Defendant Rubio, nor any other officer, informed Health Services staff of the circumstances or extent of Ms. Smith's head trauma, including the number of blows to her head. Defendants Hodges and Rubio withheld from medical staff information necessary to properly assess the extent of Ms. Smith's injuries and/or commence a concussion protocol.

42.    Ms. Smith had multiple abrasions around her lips, face, and forehead, in addition to muscle pain in her face. She was also in shock with a splitting headache and nausea. Because she had just been beaten while trying to file a grievance and was afraid of retaliation, Ms. Smith did not disclose the extent of her symptoms to medical personnel, or anyone else, and did not file a grievance related to the incident.

43.    Despite her being punched in the head nearly fifty times, no one evaluated Ms. Smith for a concussion or traumatic brain injury. She left Health Services with five days' worth of ibuprofen, and an antiseptic and topical antibiotic ointment to treat her abrasions.

44.    Upon information and belief, Defendants, including supervisors Defendants

Hodges and Alford, failed to comply with the documentation requirements in the Harris County Sheriff's Office Use of Force policy, CJC-307.VI. Upon information and belief, only one report was completed by Defendant Franco; no other Defendant complied with the requirement to submit their own reports. Nor, upon information and belief, did any Defendant obtain a signed refusal to submit a statement from Ms. Smith, or complete a "Use of Force Medical Receipt Form," as required by County policy. *See id.* at VI.3, 5. Further, the officers who escorted Ms. Smith to Health Services were directly involved in the use of force against her, a violation of HCJ policy requiring "exigent circumstances" to justify an assaulting officer, rather than an uninvolved party, escorting the person they assaulted to the medical clinic. *Id.* at VI.5.c.

45.     Shortly thereafter, Harris County charged Ms. Smith with assaulting a jail or detention facility employee, but the case was quickly dismissed for lack of probable cause.

**D. Ms. Smith was traumatized by the assault and received no follow-up care.**

46.     After leaving Health Services, Ms. Smith spent the rest of her time in the HCJ in solitary confinement in the jail's "J Wing." During her first night in solitary, the jail provided no water, blanket, or mattress, only a metal bed frame. Ms. Smith had a severe headache her entire first night but she was afraid to tell anyone, and struggled to sleep.

47.     Ms. Smith remained in solitary confinement for approximately two weeks. She struggled with her mental health, feeling hopeless and alone, but was afraid to tell jail providers about her mental and physical symptoms, including persistent headaches and difficulty sleeping.

48.     HCJ staff and supervisors, including those who assaulted her, continued to taunt Ms. Smith in the days following the incident. Defendant Rubio told Ms. Smith to "pick her head up" so her black eye was displayed. Before she was placed in J Wing, a captain told her threateningly that "they like to jump people in J" and threatened to tell other staff that Ms. Smith

"fought" Defendant Franco in order to put a target on her back.

49.    While in J Wing, Ms. Smith witnessed at least two other assaults, which added to her fear of speaking with staff about her headaches and other symptoms or bringing attention to herself in any way. In one instance, an officer opened Ms. Smith's neighbor's tray slot, spit on her, and poured milk on her. In another, an officer started a fistfight with a woman, then radioed for backup, put the woman in a cell, and sprayed her with mace. After this woman had been sprayed, other officers arrived and jumped in to assault her.

50.    Weeks later, Ms. Smith was extradited to Montgomery County, Pennsylvania, where she served several additional weeks in jail on a 2019 charge for theft by deception (false impression) from when she was younger. She continued to experience headaches while she was there, but was too scared to tell anyone about her symptoms after her experience in the HCJ. Upon her release from Montgomery County, Ms. Smith returned to New York in September 2023.

51.    Aside from her initial prescription of ibuprofen, Ms. Smith received no painkillers or other medication because no one conducted any independent follow-up on Ms. Smith's injuries, and Ms. Smith was afraid to request medication or medical care. Ms. Smith was never evaluated for a concussion or lasting head trauma.

**E.  Ms. Smith has lasting physical and psychological symptoms from the assault that continue to affect her daily life.**

52.    In the year following her assault, Ms. Smith continued getting headaches on a weekly basis. Her headaches have since reduced in frequency, occurring anywhere from approximately twice a month to several in a single day, and continue to impact her daily life. Prior to the assault, Ms. Smith never suffered from consistent or regular headaches.

53.    Ms. Smith also experiences dizziness accompanying her headaches. When she stands up, she often feels dizzy. She did not experience dizziness before the assault. The headaches

and dizziness are severe and frequent enough that her close friends can now recognize when she is experiencing these symptoms, and when to help her regain her balance.

54.     In addition, Ms. Smith experiences tinnitus—a ringing or buzzing in her ears—on occasion, which she never experienced before the assault. She also now feels discomfort in her ear that is exacerbated in the cold.

55.     Because of the assault, Ms. Smith also has excruciating back pain. During the incident, she was thrown to the floor on her back, and now, after sitting for long periods or when bending over, sometimes experiences debilitating pain. She has bouts of back pain multiple times each week despite never having back pain before the assault. In such instances, she feels severe disc pain when she bends over, such that she must remain still and then slowly ease out of the painful position. Her pain has worsened over time and become so severe that when she is in the midst of a bout of back pain, she cannot lift heavy objects—including her four-year-old son.

56.     The assault has continued to affect Ms. Smith's daily life in other ways. After the assault, she became paranoid and lonely, and experienced anxiety and thoughts of suicide for the first time in her life. She felt isolated and unmotivated, often unable to get out of bed for work or school, or even to prepare a meal for herself. She felt ashamed about the assault and tried to push it to the back of her mind. Although she mentioned it to close family members and her roommate, she hid it from most others in her life out of fear of what they would think of her, and because reliving it continued to be painful. While time has helped her cope with some of these effects, Ms. Smith continues to experience anxiety, hypervigilance, and other symptoms from the assault. She continues to have difficulty sleeping, as her mind races, replaying the assault. Even now, talking about the assault brings her to tears.

57.     Since the assault, Ms. Smith's weight has fluctuated dramatically, including falling,

at the lowest, to only 93 pounds. At times she had no appetite or was too lethargic or dizzy to get out of bed even to eat.

58.     Ms. Smith has also experienced a decline in her short-term memory because of the assault, and she sometimes has difficulty remembering events from earlier in the day.

59.     In spite of her injuries, Ms. Smith started school at ACE Institute of Technology in February 2025 to become a medical assistant. She was a gifted student as a child, taking advanced classes and even skipping a grade. But because of the assault, focus and concentration have become challenging for her, and she has had to develop new ways to study to accommodate the effects of the assault. She now struggles to achieve the good grades she previously maintained.

60.     Ms. Smith's symptoms were severe enough that when she began school, she discussed her headaches with her onboarding counselor. She told her counselor that sometimes her headaches might prevent her from attending class. Her counselor offered accommodations, allowing Ms. Smith to reserve a day to use as a makeup day if needed.

61.     The assault fundamentally changed Ms. Smith. When she entered the jail, she believed the officers were supposed to keep her safe. Instead, they assaulted her.

62.     In November 2024, as part of her efforts to regain her son from placement with her mother, where he has lived since Ms. Smith entered the HCJ, Ms. Smith began to see a counselor. Although her son currently lives with her mother, Ms. Smith maintains a close relationship with her son as she works to build a life for them.

63.     Ms. Smith's counselor diagnosed her with Major Depressive Disorder for the first time, and prescribed Wellbutrin. Before the assault, Ms. Smith experienced sadness because of her relationship with her mother—as a child, Ms. Smith suffered abuse from her mother, and was placed in foster care at age sixteen. But she was never clinically depressed or suicidal until after

the assault, and to this day, she has flashbacks to it. The trauma of the assault caused her to put her life on hold for many months, and she struggled to maintain a job. Although she is working to get her life back on track, starting with school, Defendants' assault has done irreparable damage.

**F.  The Harris County Jail has an established record of fostering violence and abuse.**

64.     For Harris County and Sheriff Gonzalez, nine detention officers repeatedly striking a person in their custody in the head is nothing remarkable; assaults like Ms. Smith's are routine in the HCJ. Defendants Harris County and Sheriff Gonzalez have fostered a culture of violence in the HCJ that led directly to Ms. Smith's assault. In November 2024, KHOU 11 released an investigation (the "KHOU Punching Investigation") documenting more than 800 incidents of jail staff punching residents in the head under "questionable" circumstances between January 2020 and December 2023.[5] Numerous officers admitted to punching detainees multiple times in the head after verbal altercations, following resistance with little potential for injury, or for no reason at all.[6]

65.     According to one former Harris County DO, the culture among staff encouraged them to treat "prisoners as a punching bag."[7] For HCJ staff, "[t]he more use[-]of[-]forces you have, the more bragging rights you have."[8]

66.     In some cases, the widespread condonement of violence led officers to punch and beat residents to death—such as in the widely publicized cases of Jaquaree Simmons and Jacoby Pillow.[9] But even as these deaths were being investigated and charges filed, Defendant Sheriff

---

[5] *See* KHOU 11, *Struck*, *supra* n. 1.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *See id.; see also* Cory McCord, *Detention officer charged in inmate's death for first time at Harris County Jail, DA's office says*, KHOU 11 (Feb. 8, 2023), https://www.khou.com/article/news/crime/harris-county-jail-officer-charged-manslaughter/285-dcfd50a5-71e4-45cd-a7bb-f4246c7a3974 (last visited June 8, 2025); Lucio Vasquez, *FBI agrees to review two deaths at Harris County Jail as families demand federal investigation*, HOUSTON PUBLIC MEDIA (Feb. 13, 2023), https://www.houstonpublicmedia.org/articles/news/criminal-justice/2023/02/13/443608/fbi-agrees-to-

Gonzalez's staff continued to routinely use violence.

67.    For example, Defendant Sheriff Gonzalez allowed seven officers to continue supervising residents even after all seven had been arrested in 2024 for six separate head-punching incidents that occurred in 2022.[10] After they were allowed to go back to work, each of the seven officers punched other residents in the head.[11] Asked about the decision to allow them to return to work, Defendant Sheriff Gonzalez said, "A better decision would probably be to remove an individual in that type of situation off the floors."[12]

68.    Time and again, external observers, courts, and county and state leaders have recognized the abuses that occur regularly behind the walls of the jail. Indeed, in 2023, the year of Ms. Smith's assault, 19 people died in custody in the HCJ, down from an astonishing 27 deaths in custody the preceding year.[13]

69.    In response to the KHOU Punching Investigation, Defendant Sheriff Gonzalez admitted to deficiencies in training, as these hundreds of punching incidents were allowed to occur despite his claim that "we do not teach them to strike in the head."[14]

70.    Speaking about the investigation, Defendant Gonzalez conceded, "I think my track record is one that you know we always do try to identify whenever there's an issue," but "there's times when we're going to fall short."[15]

71.    Defendant Gonzalez, as the County's final policymaker over the jail, knew of this

---

review-two-deaths-at-harris-county-jail-as-families-demand-federal-investigation/ (last visited June 8, 2025).

[10] *See* KHOU 11, *Struck*, *supra* n. 1.

[11] *Id.*

[12] *Id.*

[13] *Id.*; *see also* Lucio Vasquez, *Year in Review: County officials invested millions into the Harris County Jail as challenges persist*, HOUSTON PUBLIC MEDIA (Dec. 20, 2023) https://www.houstonpublicmedia.org/articles/news/criminal-justice/2023/12/20/472477/harris-county-jail-deaths-millions-invested-2023/ (last visited June 8, 2025).

[14] *See* KHOU 11, *Struck*, *supra* n. 1.

[15] *Id.*

culture of violence and repeated staff assaults on people like Ms. Smith. Even as a candidate for office, he acknowledged, "We've got to end this culture that quickly leads to physical altercation [in the jail.]"[16] In Defendant Gonzalez's own words, such a change necessarily "starts with leadership," and "we . . . need to improve training as well."[17]

72.    Then-candidate Gonzalez had good reason to lament the frequency of physical force inside the jail. Several years prior, in 2009, the United States Department of Justice released a report excoriating the HCJ and documenting "serious concerns about the use of force at the Jail."[18] According to DOJ, "the Jail lack[ed] . . . a minimally adequate system for deterring excessive use of force[,]" which left the authors with "serious concerns about the use of force at the Jail."[19] DOJ continued, "[a]s a result of systemic deficiencies including a lack of appropriate policies and training, the Jail expose[d] detainees to harm or risk of harm from excessive use of force."[20] In sum, "staff use hazardous restraint and force techniques without appropriate guidance or sanction," which "[i]n some cases" leads to "notable injuries, such as lacerations to the scalp or eye."[21] Further, "when force was investigated by supervisors, it appears that the supervisors often determined that staff's use of force was appropriate without obtaining independent medical review or multiple witness statements."[22]

73.    More recently, the Texas Commission on Jail Standards ("TCJS") published a report of noncompliance on November 15, 2021, finding insufficient face-to-face observations and use of supervisors and other essential personnel to meet housing unit staffing needs. The inspector there made a special note of "the heightened level of tension and inmate hostility at the Harris

---

[16] ABC 13 Sheriff Debate, *supra* n. 3.
[17] *Id.*
[18] *See* DOJ Report, *supra* n. 2.
[19] *Id.* at 14–15.
[20] *Id.* at 15.
[21] *Id.* at 16.
[22] *Id.*

County Jail System" due to issues with staffing and compliance, and an increase in assaults year over year.[23] During Defendant Sheriff Gonzalez's time in office, the TCJS has published at least ten notices of non-compliance directly implicating issues with staff in the jail.[24]

74.     After the KHOU Punching Investigation was released, in 2025, Defendant Sheriff Gonzalez conceded, "What we were seeing is that there were times when [head strikes were] almost an impulsive reaction or the first reaction . . .  and so that's unacceptable[.]"[25]

75.     Still, in 2025, almost a decade into his tenure, Defendant Sheriff Gonzalez admitted the need for better training on use of force and punching among his staff.[26] Indeed, multiple HCJ training documents—to the extent they are used—contain no or few mentions of punching by staff, and the few mentions are cursory and lack real guidance or limitations. Moreover, staff are not properly trained on documentation following a use of force, and supervisory officers too often fail to ensure that their subordinates comply with those reporting requirements that do exist, further inhibiting accountability for, and reduction of, the wanton use of force by officers.

76.     Thus, Defendant Sheriff Gonzalez knew of, and deliberately disregarded, a custom, practice, or policy of his officers using repeated excessive strikes to the head to discipline people in his custody. And despite his knowledge, Defendant Gonzalez failed to institute remedial

---

[23] Texas Commission on Jail Standards, Harris County Jail – Special Inspection Report (Nov. 15–17, 2021), available at https://www.tcjs.state.tx.us/wp-content/uploads/2021/12/Harris_Special_NC_12-6-2021.pdf.

[24] Recent cases filed against the HCJ in this district confirm that factual allegations like those made here—that there exists a culture of punching as an acceptable behavior in the HCJ, leading to a violation of the plaintiff's constitutional rights—are sufficient to state a claim for which relief may be granted. *See Howell v. Harris County*, No. 4:24-CV-468, 2024 WL 3647012, at *1 (S.D. Tex. Aug. 1, 2024) (denying motion to dismiss where defendant officer's "punches seriously injured Howell"); *Wagner v. Harris County*, No. 4:23-CV-02886, 2024 WL 2836332, at *4 (S.D. Tex. June 4, 2024) (denying motion to dismiss where at least four plaintiffs were punched by officers, among 27 total who suffered injuries or death); *Bartee v. Harris County*, No. 4:16-CV-02944, 2020 WL 12575071, at *1 (S.D. Tex. June 23, 2020) (discussing cross-claim of defendant officer who "allegedly punched Plaintiff numerous times in the head and face while the other officers held Plaintiff down.").

[25] Jeremy Rogalski & Tina Macias, *Harris County sheriff changes punching policy at jail after KHOU 11 Investigation*, KHOU 11 (Jan. 8, 2025), https://www.khou.com/article/news/investigations/harris-county-jail-punching-policy/285-455486bd-890e-4e01-84c9-40c0c39d1f0b (last visited June 8, 2025) [hereinafter "KHOU 11, Sheriff Changes Punching Policy"].

[26] *Id.*

measures to curb the culture of excessive force, particularly with regards to head punches like those the Individual Defendants inflicted on Ms. Smith.

77.    In many jurisdictions, such as Bexar County, jail policies recognize that repeated blows to the head may constitute deadly force and should be used only in extreme circumstances.[27] At the time of Ms. Smith's assault, though, upon information and belief, neither Harris County nor Defendant Sheriff Gonzalez imposed *any* restrictions on head punches. At the time, the policy simply stated, "Hard empty hand control includes striking and stunning blows, like kicks, knee, or elbow strikes, and has a possibility of soft or connective tissue damage, skin lacerations, or bone fractures." Harris County Jail Policy 501(VI)(C), "De-escalation & Response to Resistance." Unlike policies in other jurisdictions, the policy offered no meaningful guidance or limitations, merely listing punching as an "[o]ption[] employees may consider" in their assessment of "the totality of the circumstances of the incident and what type of response may be reasonable." *Id.* at 501(VI).

78.    A 2024 training guide confirms the lack of guidance on whether and when to use head strikes. In the materials for a 2024 Harris County Sheriff's Academy course on use of force, neither punching nor "hard empty hand control" were mentioned at all.[28] Other training materials and lesson plans merely list "hard empty hand control" as one option on the use of force continuum without providing guidance or limitations.[29]

79.    Defendant Sheriff Gonzalez himself all but admitted, as part of KHOU's Punching Investigation in 2024, that he had disregarded the frequency of head strikes and their risk for injury.

---

[27] *See*, *e.g.*, Bexar County Sheriff's Office, Manual of Policy and Procedure, 9.10, Use of Deadly Force (Apr. 15, 2014), at 106, available at https://media.ksat.com/document_dev/2015/09/01/BCSO-Use-of-Force-Policy_158911_ver1.0.pdf.

[28] Harris County Sheriff's Academy, "Use of Force in Detention Refresher," Texas Commission on Law Enforcement Course No. 2095 (Aug. 13, 2024).

[29] Harris County Sheriff's Academy, Instructor's Lesson Plan, "Use of Force in Jail Setting," Course No. 3504 (Jan. 2010).

He told KHOU that, when it came to "strikes to the head," he "think[s] we weren't firm enough or clear enough to really address that part of it."[30] In response to the KHOU Punching Investigation, in early 2025, Sheriff Gonzalez unveiled changes to the HCJ's policy regarding punching, adding that "[s]trong or repeated blows to the head, face, neck, or throat could be considered deadly force and should only be considered when maximum effectiveness is needed to subdue a subject that poses a special threat due to factors used to determine reasonableness."[31] Despite repeated incidents with staff and acknowledgement by Defendant Gonzalez of the lack of guidance and training, this update was not put in place until nearly eighteen months after Ms. Smith's assault.

80.    The KHOU Punching Investigation, Defendant Sheriff Gonzalez's public comments, prior reports condemning use of force in the HCJ, and Ms. Smith's case illustrate a custom or practice of unchecked excessive force at the HCJ in the years leading up to and including Ms. Smith's assault. Based on the frequency of head punches, his public comments, and Harris County's previous track record regarding excessive force, Defendant Gonzalez knew of, or deliberately disregarded, this practice and custom, which were the moving force of the Fourteenth Amendment violations inflicted on Ms. Smith.

81.    Despite Defendant Sheriff Gonzalez's acknowledgment of the culture of violence and need for policy change, the issues with staff use of force continued throughout his tenure in office. Defendant Gonzalez and the County implemented, fostered, and condoned a culture of violence and custom or practice of excessively striking detainees. Taken together, the blatant gaps in HCJ policy, as well as the failure to train and supervise staff on the policies that did exist, led to the violation of Ms. Smith's rights under the Fourteenth Amendment.

---

[30] *See* KHOU 11, *Struck*, *supra* n. 1.
[31] *See* KHOU 11, *Sheriff Changes Punching Policy*, *supra* n. 25.

## V. CAUSES OF ACTION

### Count I. Municipal Liability for
### Fourteenth Amendment Violation – Conditions of Confinement
### *Monell v. Dep't of Soc. Servs. of City of N.Y.*
### (As to Defendant Harris County) (42 U.S.C. § 1983)

82.     Plaintiff incorporates by reference the preceding paragraphs.

83.     A municipality may be held liable for constitutional violations if a plaintiff establishes that there was "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)). "Actual or constructive knowledge [of the challenged policy or] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Id.* (cleaned up).

84.     Under Texas law, the policymaker for the Harris County Jail is the Harris County Sheriff "by virtue of the office to which [he] has been elected[.]" *See Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990); *see also* Tex. Loc. Gov't. Code §§ 351.034(a), 351.035, 351.041(a) (setting out county sheriff's powers, duties, and responsibilities as administrator and keeper of the county jail). From 2017 to the time of filing, including during Ms. Smith's assault in 2023, the Harris County Sheriff was Defendant Gonzalez. All HCJ policies and customs are the responsibility of the Sheriff as policymaker, regardless of who holds that office.

85.     Harris County and Sheriff Gonzalez "imposed what amounts to punishment in advance of trial on pretrial detainees," sufficient to establish municipal liability, by subjecting Ms. Smith to unconstitutional "conditions of confinement" that led to violations of her constitutional rights. *Sanchez v. Young County*, 866 F.3d 274, 279 (5th Cir. 2017). The municipality or official's "intent [to punish] may be inferred from the decision to expose a detainee to an unconstitutional

condition." *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009). "[A] condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Id.* (quoting *Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996) (en banc)).

86.    Here, as set out above, the conditions of confinement at the HCJ reflected a policy or custom, and engrained culture, of systemic and excessive use of force at the jail. This policy or custom is evidenced by HCJ staff's pervasive, years-long pattern of repeated, unchecked, and routine uses of excessive force, whereby punching was condoned as a one-size-fits-all tool for managing detained individuals. Exacerbating this condition of confinement were the jail's poor to non-existent procedures for training and supervising staff, and for disciplining staff for inadequate or falsified after-the-fact reporting.

87.    Indeed, stretching as far back as the 2009 DOJ Report, a slew of observers, officials, journalists, TCJS reports, and other sources have repeatedly documented the concerning overreliance on force at the HCJ. The culture of violence at the HCJ is corroborated by Defendant Sheriff Gonzalez's repeated public statements acknowledging this violence and the recognized need for change coming from jail leadership. These deficiencies have gone unresolved in the more than a decade since that report, as confirmed in the recent KHOU Punching Investigation.

88.    As the wealth of news reports, investigations, notices, public statements, and legal actions set out above demonstrate, Defendant Sheriff Gonzalez knew of the dangerous staff behavior, including punching specifically, the need for training, the failure to engage in de-escalation, and the culture of physical altercations in the HCJ. Despite that knowledge and awareness, the culture and practices of violence in the jail continued to proliferate under his watch.

89.     The longstanding and pervasive pattern of HCJ staff using excessive force against detainees constituted a *de facto* policy of inflicting such violence for which there was not, and cannot be, any legitimate penological purpose. The conditions of confinement during Ms. Smith's detention in the HCJ reflected this policy, and it was the moving force behind the Individual Defendants' use of excessive force, in violation of the Fourteenth Amendment, against Ms. Smith. Moreover, Defendant Gonzalez knew of this policy or custom of inflicting punching and other violence on detainees, which was in place both before and during his tenure, and allowed it to persist throughout his time in office. Indeed, his actions and omissions paved the way for the widespread use of force to continue.

90.     Plaintiff therefore seeks relief against Defendant Harris County in the form of compensatory damages for violation of the Fourteenth Amendment causing pain, suffering, physical injury, mental anguish, and emotional distress.

### Count II. Municipal Liability for
### Fourteenth Amendment Violation – Episodic Acts or Omissions
### *Monell v. Dep't of Soc. Servs. of City of N.Y.*
### (As to Defendant Harris County) (42 U.S.C. § 1983)

91.     Plaintiff incorporates by reference the preceding paragraphs.

92.     As stated above, a municipality may be held liable for constitutional violations that are caused by its customs and policies. *See Monell*, 436 U.S. at 694. To establish municipal liability for unconstitutional acts or omissions, a plaintiff must identify the act or omission and then "point[] derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Shepherd*, 591 F.3d at 452 (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997)).

93.     Defendant Sheriff Gonzalez is the policymaker for the HCJ.

94.     HCJ officers and sergeants, the Individual Defendants here, violated Ms. Smith's

Fourteenth Amendment rights by their acts or omissions. Those constitutional violations were caused by Harris County's policies or customs, sufficient to establish the County's municipal liability for the assault.

95.     The Individual Defendants struck Ms. Smith repeatedly, despite knowing that Ms. Smith posed virtually no threat to them, particularly after she had been subdued on the floor. The Individual Defendants assaulted Ms. Smith due to a policy or custom of resorting to punching detained individuals rather than engaging in de-escalation or attempting to minimize the force used.

96.     In fact, Defendant Franco herself *escalated* the situation by first verbally attacking, taunting, and provoking Ms. Smith, and then by punching Ms. Smith when Ms. Smith posed no physical threat to her. Each officer to join the confrontation contributed to the escalation against a 107-pound, unarmed woman. These actions were consistent with the policy or custom of violence, and of using punching as a one-size-fits-all tool for managing detained individuals, in the HCJ.

97.     Further, HCJ policy at the time condoned punching, or "hard empty hand control," without providing meaningful training, guidance, or limitations on its use. The lack of such training or guidance after years of documented overuse of force, and punching in particular, along with a pattern of failing to discipline staff for inadequate or falsified after-the-fact reporting, both contributed to and underscores the existence of the policy or custom that led to Ms. Smith's assault.

98.     The Individual Defendants, as well as Defendant Harris County, through its policymaker Defendant Sheriff Gonzalez, knew of the dangerous customs of violence, and the lack of policies to effectively proscribe such customs. Yet the Individual Defendants used unreasonably excessive force on Ms. Smith in a manner sanctioned by HCJ policy or custom. Harris County's policy or custom was therefore the moving force behind the actions of Defendants in violation of

Ms. Smith's Fourteenth Amendment rights.

99.     Plaintiff seeks relief against Defendant Harris County in the form of compensatory damages for violation of the Fourteenth Amendment causing pain, suffering, physical injury, mental anguish, and emotional distress.

**Count III. Municipal Liability – Failure to Train**
*Monell v. Dep't of Soc. Servs. of City of N.Y.*
**(As to Defendant Harris County) (42 U.S.C. § 1983)**

100.     Plaintiff incorporates by reference the preceding paragraphs.

101.     A municipality may also be held liable for constitutional violations under *Monell* based on the failure to train employees "where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officer] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). A "[c]ounty may be liable for the decision of . . . a policymaker, not to train" its staff where the plaintiff establishes "(1) a decision by a decisionmaker that amounts to a policy under *Monell* and its progeny;" that is "(2) . . . so deliberately indifferent to the rights of the citizens that the County fairly can be said to be culpable for the injury; and (3) sufficient causation between the specific policy decision and the resulting constitutional injury." *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000).

102.     Defendant Sheriff Gonzalez is the policymaker for the HCJ.

103.     Defendant Sheriff Gonzalez has been aware of, and failed to remedy, the rampant culture of violence that has plagued the HCJ for years, which has inevitably led to violations of the Fourteenth Amendment rights of those detained in the HCJ. The history of reports from the DOJ and TCJS, the KHOU Punching Investigation, and numerous cases documenting similar facts establish the engrained culture and customs under Defendant Sheriff Gonzalez's direction, and the lack of improvement that even he acknowledged was needed in the jail.

104.    Despite this awareness and acknowledgement of the severe issues with safety, violence, and staffing in the jail, Defendant Sheriff Gonzalez failed to provide staff with the training and supervision necessary to change this culture and to ensure the safety and protection of jail residents, or to take any meaningful action to or effectuate such training or supervision.

105.    Defendant Sheriff Gonzalez and the HCJ failed to supervise and train staff on proper use of force and de-escalation. The HCJ routinely allows force to be used unchecked in circumstances under which force could not reasonably be justified, and allows staff to cover up their unacceptable force through inadequate, if not falsified, reporting. Supervisory staff participate in and condone such use of force and inadequate reporting.

106.    Defendant Gonzalez and other jail administrators were deliberately indifferent in their refusal to provide appropriate training and supervision of HCJ staff in the face of this rampant and obvious history of misconduct, which led to repeated constitutional violations, including violations of Ms. Smith's Fourteenth Amendment rights.

107.    Plaintiff seeks relief in the form of compensatory damages for violation of the Fourteenth Amendment causing pain, suffering, physical injury, mental anguish, and emotional distress.

**Count IV.  Fourteenth Amendment – Supervisory Liability
(As to Defendant Sheriff Gonzalez) (42 U.S.C. § 1983)**

108.    Plaintiff incorporates by reference the preceding paragraphs.

109.    A supervisor can be liable for a failure to train or supervise if: "1) the supervisor either failed to supervise or train the subordinate official; 2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's right; and 3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)).

110.    Defendant Sheriff Gonzalez is the chief jail administrator of the Harris County Jail. *See* §§ 351.034, 351.041 ("The sheriff shall safely keep all prisoners committed to the jail[.]"). He is therefore responsible for supervising jail employees.[32] Defendant Gonzalez knew of the rampant culture of violence among Harris County DOs and other staff, which manifested in officers regularly using excessive strikes to residents' bodies and heads in response to non-violent behavioral issues in the jail. Even though Defendant Gonzalez knew that officers used such head strikes against residents, he failed to provide—and admitted he failed to provide—training or guidance on the appropriate circumstances in which officers should—or should not—use head strikes.

111.    This lack of training and supervision led to Ms. Smith's assault by multiple officers, including dozens of blows to the head while she was on the floor and not resisting.

112.    Defendant Sheriff Gonzalez knew of, or disregarded, the risk that head punching poses to people in his custody, and did nothing to diminish the frequency of such punching. He therefore acted with deliberate indifference to the risk of excessive force, which resulted in his supervisees violating Ms. Smith's constitutional rights.

113.    Ms. Smith seeks relief in the form of compensatory and punitive damages against Defendant Sheriff Gonzalez for violations of the Fourteenth Amendment causing pain, suffering, physical injury, mental anguish, and emotional distress.

### Count V.  Fourteenth Amendment Excessive Force
### (As to Defendants Franco, Lewis, Haynes, and Rubio) (42 U.S.C. § 1983)

114.    Plaintiff incorporates by reference the preceding paragraphs.

115.    The Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, prohibits

---

[32] *See* Harris County Jail Department Manual, 107.III.A, available at https://hcsopolicy.com/policy/107-rank-structure/ ("The Sheriff has final authority for determining HCSO policies together with full responsibility for the complete discharge of all duties imposed by law.").

jail officials from inflicting excessive force on individuals in their custody. In a claim for excessive force, "a pretrial detainee must show only that the force purposely or knowingly used against [her] was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015).

116.    The Individual Defendants purposely used force against Ms. Smith, causing her injuries. The force the Individual Defendants used was objectively unreasonable.

117.    Ms. Smith is five feet, three inches tall and weighed 107 pounds at the time of the assault. She was unarmed, and had nothing in her hands. No other detained individuals were present in the hallway to complicate the situation. No officer could reasonably have perceived a physical threat or severe security issue from Ms. Smith sufficient to justify initiating a physical altercation or engaging in a nine-person assault.

118.    Defendant Franco instigated a verbal altercation with Ms. Smith, and subsequently initiated a physical altercation. Defendant Franco punched Ms. Smith when Ms. Smith had not touched her, and posed no physical threat. At the outset of the altercation, there was no need whatsoever for Defendant Franco to engage in physical force. Rather than use de-escalation techniques, as per HCJ written policy, Defendant Franco created a violent situation from an exchange of words that she herself caused and escalated.

119.    Although Ms. Smith initially slapped back in self-defense to Defendant Franco's punching, Ms. Smith quickly stopped, and did not resist as other officers joined the fray.

120.    Defendant Franco made no attempt to temper or moderate the amount of force she used; rather, she *increased* her force throughout the assault, even as backup arrived and Ms. Smith ceased anything remotely resembling resistance.

121.    Defendant Franco continued taking turns with other officers to punch Ms. Smith in the head as Ms. Smith lay on the floor, at times in the fetal position, decidedly compliant.

Defendant Franco could not reasonably have perceived a threat or security risk from a small, incapacitated individual pinned to the floor by Defendant Franco and her peers.

122.    Defendant Franco's use of force against Ms. Smith was objectively unreasonable, and caused Ms. Smith immediate and lasting physical, mental, and emotional injury.

123.    Defendants Lewis and Haynes joined the altercation when Defendant Franco was actively punching Ms. Smith. Although there may have been initial confusion in encountering the situation, Defendants Lewis and Haynes made no effort to engage in de-escalation, or to evaluate what was happening. Instead, they immediately began punching, compounding the force used against Ms. Smith. They drove her into the wall, punched her to the ground, and dragged her across the floor, all the while delivering continuous punches to her head.

124.    Ms. Smith ceased anything arguably resembling resistance shortly after Defendants Lewis and Haynes joined the assault and forced her to the floor. Yet despite the lack of resistance, and despite any reasonable threat or security risk from Ms. Smith, Defendants Lewis and Haynes continued to strike, drag, and otherwise assault Ms. Smith. They continued their assault even as more officers joined in. Defendants Lewis and Haynes used force against Ms. Smith in a manner that was objectively unreasonable, and caused her immediate and lasting physical, mental, and emotional injury.

125.    Defendant Rubio entered the assault when Ms. Smith was on the floor, being punched and dragged by three other officers, and not resisting. Defendant Rubio immediately began punching Ms. Smith in the head, again without making any attempt to assess or de-escalate the situation, or temper the amount of force used. She continued delivering hard blows, dragging, and otherwise assaulting Ms. Smith throughout the duration of the altercation even as it was clear that Ms. Smith posed no resistance, threat, or security issue.

126.    Defendant Rubio escorted Ms. Smith to medical after the assault. Upon information and belief, she taunted and threatened Ms. Smith, which, along with the physical assault, intimidated Ms. Smith into deciding not to submit a statement during the reporting of the incident, file a grievance, or request additional medical care. Defendant Rubio further failed to provide medical staff with information regarding Ms. Smith's assault necessary to initiate a concussion protocol.

127.    Defendant Rubio used force against Ms. Smith in a manner that was objectively unreasonable, and caused her immediate and lasting physical, mental, and emotional injury.

128.    Plaintiff seeks relief in the form of compensatory and punitive damages as to all Individual Defendants for violations of the Fourteenth Amendment causing pain, suffering, physical injury, mental anguish, and emotional distress.

### Count VI.  First Amendment Retaliation
### (As to Defendant Franco) (42 U.S.C. § 1983)

129.    Plaintiff incorporates by reference the preceding paragraphs.

130.    "To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006).

131.    Ms. Smith attempted to file a grievance against Defendant Franco, which is a protected First Amendment activity. Defendant Franco knew Ms. Smith intended to file a grievance against her, followed her to the location where Ms. Smith had to go to obtain a grievance form (the command center), and taunted her with a barrage of insults. Then, when Ms. Smith finally responded to Defendant Franco's insults, Defendant Franco punched her in the head.

132.    Defendant Franco intentionally prevented Ms. Smith from filing a grievance by

provoking a confrontation with her and hitting Ms. Smith in the face. But for Ms. Smith's attempt to file a grievance, Defendant Franco would not have hit her.

133.    Defendant Franco continued punching Ms. Smith repeatedly in the head, thirteen times in all, while Ms. Smith was defenseless on the floor, demonstrating her animus against Ms. Smith for attempting to file a grievance against Defendant Franco.

134.    Ms. Smith seeks relief against Defendant Franco in the form of compensatory and punitive damages for violation of the First Amendment causing pain, suffering, physical injury, mental anguish, and emotional distress.

### Count VII.  Fourteenth Amendment Excessive Force – Supervisory Liability (As to Defendants Hodges and Alford) (42 U.S.C. § 1983)

135.    Plaintiff incorporates by reference the preceding paragraphs.

136.    A supervisory official may be held liable if 1) he or she "affirmatively participates" in a constitutional deprivation, or 2) "implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). A supervisor can be liable for a failure to train or supervise if: "1) the supervisor either failed to supervise or train the subordinate official; 2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's right; and 3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)).

137.    Defendants Sergeants Hodges and Alford were supervisors of the other officers involved in Ms. Smith's assault. Defendants Hodges and Alford personally participated in, observed and encouraged subordinates participating in, failed to intercede in, and failed to provide training and supervision to prevent, Ms. Smith's assault.

138.    Defendant Alford ran onto the scene as multiple officers surrounded Ms. Smith, lying defenseless on the floor, pummeling her in the head. Defendant Alford aided in surrounding Ms. Smith, and took no action to restrain his officers from punching a clearly subdued detainee repeatedly in the head. Defendant Alford failed to supervise officers engaged in an ongoing assault for which there could be no reasonable justification. Because of Defendant Alford's failures to supervise and train, the assault continued unchecked. Defendant Alford's failure to train and supervise his subordinates led them to assault Ms. Smith rather than engaging in proper de-escalation strategies.

139.    Defendant Hodges entered the scene at the end of the assault. It is unknown how long she observed before stepping into view of the video recording. Defendant Hodges's failure to train and supervise her subordinates led them to assault Ms. Smith rather than engaging in proper de-escalation strategies.

140.    Following the assault, Defendant Hodges escorted Ms. Smith to medical. She taunted or allowed other subordinate officers to taunt and threaten Ms. Smith, which, combined with the physical assault, intimidated her into deciding not to submit a statement during the reporting of the incident, file a grievance, or request additional medical care. Defendant Hodges further failed to provide medical staff with information regarding Ms. Smith's assault necessary to properly assess Ms. Smith's injuries, including initiating a concussion protocol, or to ensure that her subordinates, Defendant Rubio and Officer Dupont, were instructed and trained to provide such information.

141.    Plaintiff seeks relief against these Defendants in the form of compensatory and punitive damages for violations of the Fourteenth Amendment causing pain, suffering, physical injury, mental anguish, and emotional distress.

### Count VIII.  Fourteenth Amendment Failure to Intervene
### (As to Defendant Alford) (42 U.S.C. § 1983)

142.    Plaintiff incorporates by reference the preceding paragraphs.

143.    An officer, or supervisory official, "is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020) (cleaned up). "[A] supervisory officer is liable under [section] 1983 if he refuses to intervene where his subordinates are beating an inmate in his presence." *Harris v. Chanclor*, 537 F.2d 203, 206 (5th Cir. 1976).

144.    Defendant Alford failed to intervene in Ms. Smith's assault, standing by as his subordinates repeatedly punched Ms. Smith in the head.

145.    When Defendant Alford ran into the scene, Ms. Smith was on the floor, surrounded by four officers. Ms. Smith posed no threat to any officer present or to Defendant Alford.

146.    As Defendant Alford looked on, and even moved around for a closer view of Ms. Smith, two different officers punched Ms. Smith in the head no fewer than 18 times.

147.    When Defendant Alford entered the scene, it was clear that if Ms. Smith had ever posed a threat to his officers, she no longer did. At that point, Defendant Alford knew his subordinates were using excessive force against Ms. Smith but took no steps to object, intervene, or prevent the continuation of the constitutional violation. Rather, he allowed his subordinate officers to continue assaulting Ms. Smith in his presence.

148.    Defendant Alford's failure to intervene violated Ms. Smith's right to be free from excessive force. Ms. Smith seeks relief against Defendant Alford in the form of compensatory and punitive damages for violation of the Fourteenth Amendment causing pain, suffering, physical

injury, mental anguish, and emotional distress.

## VI. JURY DEMAND

149.    Plaintiff respectfully requests that this matter be tried before a jury.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.    Award Plaintiff compensatory damages against all Defendants;

B.    Award Plaintiff punitive damages as requested;

C.    Find that Plaintiff is the prevailing party in this case and award her reasonable attorneys' fees, litigation expenses, and court costs pursuant to 42 U.S.C. § 1988; and

D.    Grant all other relief to which Plaintiff may be entitled.

DATED: June 9, 2025

Respectfully submitted,

_/s/ Michael T. Murphy_
Molly Petchenik
_Attorney in Charge_
Texas Bar No. 24134321
Southern District No. 3854546
molly@texascivilrightsproject.org
Zachary Dolling
Texas State Bar No. 24105809
Southern District No. 3290949
zachary@texascivilrightsproject.org
Christina Beeler
Texas State Bar No. 24096124
Southern District No. 3695627
christinab@texascivilrightsproject.org
Travis Fife
Texas State Bar No. 24126956
Southern District No. 3734502
travis@texascivilrightsproject.org
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Dr
Austin, Texas 78741
Tel: (512) 474-5073

WINSTON & STRAWN LLP
Michael T. Murphy
Texas Bar No. 24051098
Southern District No. 621098
mtmurphy@winston.com
Rachael E. Thompson
Texas Bar No. 24117139
Southern District No. 3640278
rthompson@winston.com
Matthew W. Frost
Texas Bar No. 24142920
(Southern District admission forthcoming)
mfrost@winston.com
800 Capitol Street
Suite 2400
Houston, TX 77002
Tel: (713) 651-2600

Kristin McGough (_pro hac vice_ forthcoming)

kmcgough@winston.com
1901 L Street NW
Washington, DC 20036
Tel: (202) 282-5000

ATTORNEYS FOR
PLAINTIFF ANASIA SMITH